IN THE UNITED STATES DISTRICT COURT

US DISTRICT COURT
NORTHERN DIST. OF TX.
FILED

FOR THE NORTHERN DISTRICT OF TEXAS

2017 JUL 28  AM 9:42

DEPUTY CLERK _____

| | | |
|---|---|---|
| ROBERT ALAN THOMPSON, | § | |
| Plaintiff, | § | |
| | § | |
| | § | |
| V. | § | CIVIL ACTION NO. |
| | § | 1:16-CV-055-BL |
| | § | |
| T. CRNKOVICH, | § | |
| HEALTH SERVICES ADMINISTRATOR, | § | |
| FPC BIG SPRING, ET AL., | § | |
| | § | |
| Defendants. | § | ASSIGNED TO U.S. MAGISTRATE JUDGE |

PLAINTIFF'S MORE DEFINITE STATEMENT

Now comes Robert Alan Thompson, Plaintiff pro se in the above styled and numbered case, and answers in detail the following inquiries and request:

(1)A. The policy Plaintiff is refering to is Program Statement 6031.04 Patient Care. This policy was stated to Plaintiff three times by three different people.

T. Crnkovich was the first person to recite this policy to the Plaintiff on November 30, 2015. This was done in her response to Plaintiff's BP-8 Administrative Remedy. In this document, Ms. Crnkovich mistakenly refers to this policy as Program Statement 6031.01 Patient Care.

J.A. Keller was the second person to recite this policy to the Plaintiff on January 6, 2016. This was done in his response to Plaintiff's BP-10 Administrative Remedy. In this document, Mr. Keller properly refers to this policy as Program Statement 6031.04 Patient Care.

1

Ian Connors was the third person to recite this policy to the Plaintiff on March 14, 2016. This was done in his response to Plaintiff's BP-11 Administrative Remedy. In this document, Mr. Connors properly refers to this policy as Program Statement 6031.04 Patient Care.

This policy reads as follows:

> **United States Department Of Justice Federal**
> **Bureau Of Prisons Program Statements.**
> **OPI: HSD/HPB Number: 6031.04(8)(b)-**
> The CD is under no obligation to follow consultant recommendations. If the recommendations are not followed, the CD will document his/her justification in the inmate health record.

Plaintiff was never verbally talked to about this Program Statement.

(1)B. In 2009, Plaintiff was incarcerated at F.C.I. Three Rivers. On July 21, 2009, Plaintiff was given an x-ray of his right knee by the medical staff there. The medical staff said that the pain Plaintiff was having was caused from an Osteoarthritic Spur Post Patella. On August 7, 2009, the medical staff issued Plaintiff a knee brace and cane for his right knee. On August 14, 2009, the medical staff gave Plaintiff an injection containing 2cc Lidocaine/ 1cc Kenalog in his right knee. The medical staff also gave Plaintiff a prescription for Naproxen 500mg tablets to be taken twice daily. The medecal staff also recommended Plaintiff for a follow-up visit in three months, but before that could happen Plaintiff was transfered from FCI Three Rivers to FCI Big Spring. Plaintiff has attached a a copy of the Bureau Of Prisons Health Services Consultation Request as "Exhibit A" in support of the above factual statements.

(1)C. On August 6, 2014, Dr. Kenneth Russell MD saw Plaintiff for his Chronic Care visit. Plaintiff's complaints at that visit were the bad headaches he had been having,  pain in his left hip,

and pain in his right knee. Dr. Russell said that Plaintiff was probably overdosing on the Naproxen 500mg tablets he was taking. Dr. Russell then started Plaintiff on 300mgs Gabapentin twice daily for the headaches and took him off the Naproxen. The pain in Plaintiff's right knee increased so he made sick call and the medical staff increased his dosage of Gabapentin to 1200mgs daily. Plaintiff again made sick call to tell them that the medication was not helping the pain so the medical staff increased his dosage again to 1800mgs of Gabapentin daily. Plaintiff then started having syptoms of depression and intrusive thoughts to the point to where he thought he was "going crazy." Plaintiff asked to talk to someone about his altered mental state and was seen by a psycologist, Dr. Bartholomew PHD on July 2,2015. Dr. Bartholomew then e-mailed Health Services and had them schedule Plaintiff to see a physician to have his medication regiment evaluated. On July 10, 2015, Plaintiff was seen again by Dr. Kenneth Russell MD who did not evaluate his medications but instead added one Fluoxetine 20mg tablet once daily for depression. On July 28, 2015, Plaintiff went back to sick call because his right knee had started locking up, popping, and causing extreme pain. Ms. Murphree RN saw Plaintiff on this occasion and increased his Gabapentin to 2400mgs daily. On July 29, 2015, Dr. Bartholomew PHD saw Plaintiff for his scheduled visit. Plaintiff told her that he was not feeling well physically and was having negative side effects from all of the medication he was taking. Plaintiff went to sick call again on September 3, 2015, and informed the medical staff that the Gabapentin was not helping at all with the pain in his right knee. Ms. Wilburn RN then prescribed Plaintiff one Meloxicam 30mg tablet and one Amitriptyline 50mg capsule once daily on top of all his other

3

medications. Plaintiff quit taking all of his medications on March 9, 2016 except for the Meloxicam 30mg tablet once daily. Plaintiff then replaced the 30mg Meloxicam tablet with 800mg Ibuprofen caplets to be taken three times daily. Plaintiff does not know the exact date when he switched these medications but can probably obtain this information from Health Services Staff if this information is needed by the Court. Plaintiff has attached documentation as proof of these facts to this document as "Exhibit B."

(1)D. On August 7, 2009, the medical staff at FCI Three Rivers issued Plantiff a cane and a knee brace. The knee brace seemed to help stabilize the movement in his knee cap and the cane eased some of the pressure on his knee. On August 14, 2009, the medical staff at FCI Three Rivers gave Plaintiff an injection containing 2cc Lidocaine/1cc Kenolog in his right knee. The injection seemed to help Plaintiff's knee for about 4 to 6 months. In 2009, Plaintiff's cane and knee brace were confiscated by BOP Staff because they contained metal during his transfer from FCI Three Rivers to FCI Big Spring. These items were never returned to the Plaintiff. On July 18, 2015, the medical staff at FCI Big Spring issued Plaintiff a cane because at the time he could hardly walk. This helped keep Plaintiff from falling down by helping relieve the pain created by walking. On November 5, 2015, the medical staff at FCI Big Spring sent Plaintiff to Dr. Darrell Franks MD were he received an injection containing Celestone Soluspan 6mg/Marcane-Epinephrine (PF)0.5% in his right knee. The injection really did not seem to help the Plaintiff at all.

(1)E. The name of the specialist who recommended surgery was Dr. Darrell Franks MD who is an Orthopedic Surgeon. The specific diagnoses from his physical examination reads as follows:

4

**Knees:**
Inspection Right: no mass, induration, warmth, or erythema and swelling (moderate effusion). Bony Palpation Right: tenderness of the medial femoral condyle, the lateral joint line, the medial joint line, and the medial tibial plateau. Soft Tissue Palpation Right: no tenderness of the prepatellar bursa, the fat pad, or the pes anserinus. Active Range Of Motion Right: pain on initiation of movement and at extreme limits of range and crepitus, flexion (100 degrees), and extension (lacks 10 degrees). Passive Range Of Motion Right: normal and pain elicited by motion. Stability Right: no laxity, subluxation, or ligamentous instability and  Lachman test negative. Special Tests Right: Mc Murray's test positive and Apley's compression test positive. Strength Right: flexion 5/5 and extension 5/5.

The specific surgery recommendation reads as follows:

**Assessment/Plan**

**Assessment:**
Severe OA of the knee. Bone on bone wear. Discussed potential treatment options with patient and explained that the most predictable thing to offer is a total knee replacement. Pt knows this will take a while and I've explained several times that his knee is very suspicious of a meniscus injury and that we can recommend an MRI and knee scope but this won't do a bit of good for the arthritis pain. Pt thinks the majority of his pain is from the arthritis. Discussed pros and cons of a knee replacement, pt wishes to proceed and his daily syptoms, lack of mobility, and extreme arthrosis on the xray certainly quality him for a surgery such as this. Discussed ways to treat his pain while we're waiting on the TKA to get approved, pt wants to try another cortisone injection, his last one was in 2009 and it lasted 6 months.

**Plan:**
1. Recommended TKA asap
2. Celestone injection today
3. Pt should be allowed to use a walker, cane, and/or wheelchair as his symptoms wax and wane in the normal progression of OA this severe
4. RTC 3 months or sooner if we can get the TKA approved between now and then
5. Educated on quad sets

(1)F. T. Crnkovich, Health Services Administrator at FCI

5

Big Spring, denied Plaintiff's request for total knee arthroplasty.

Plaintiff has deduced this from United States Department Of Justice

Federal Bureau Of Prisons Program Statement 6031.04(8). Program

Statement 6031.04(8) reads as follows:

> **Institution Utilization Review Commitee**
> **Program Statement 6031.04(8)**
> **Utilization Review-**
> Every institution will have an established Utilization
> Review Committee (URC), chaired by the Clinincal
> Director. Other members should include, but not be
> limited to the: HSA or Assistant HSA; Medical Trip
> Coordinator; health care provider(s) directly
> involved in the reviewed cases; Director Of Nursing
> (if applicable); a chaplin or social worker.
>
> The (URC) will review the following areas:
>
> outside medical, <u>surgical</u>, and dental procedures.

If the staff here at F.C.I. Big Spring follow their own

Program Statements then T . Crnkovich must have denied Planitiff's

total knee arthoplasty since she is the HSA or Health Service

Administrator. Plaintiff does not have an exact date for this

denial because  Ms. Crnkovich never gave him one. Plaintiff

was never notified in writting or verbally by the URC after

they made their decision which is normally standard procedure.

J.A. Keller, Regional Director in Grand Prairie Texas,

denied Paintiff's request for total knee arthoplasty. The exact

date of the denial was January 6, 2016 and it was given as part

of Mr. Keller's written response to Plaintiff's BP-10 Administrative

Remedy. The reason for the denial and the medical care offered

Plaintiff in place of the requested surgery is quoted directly

from Mr. Keller's response as follows:

> You had a Celestone injection administered in
> your right knee. Your total knee arthoplasty
> was disapproved with recommendations for

6

conservative management. According to Program
Statement 6031.04 <u>Patient Care</u>. the Clinical
Director is under no obligation to follow
consultant recommendations. At present, the
plan of care for your orthopedic condition
remains conservative, weight management,
exercise as tolerated, physical therapy, and
pain management. However, if your condition
worsens, you are encouraged to use the sick
call process.

Since then, Plaintiff has tried to use the sick call process

on a number of occassions. H. Sosa RN at sick call told Plaintiff

to quit coming to sick call because there is nothing further they

can do for him.

Ian Connors, Administrator National Inmate Appeals in Washington,

DC, denied Plaintiff's request for total knee arthroplasty. The

exact date of the denial was March 14, 2016 and it was given as part

of Mr. Connors' written response to Plaintiff's BP-11 Administrative

Remedy. The reason given for the denial and the medical care offered

Plaintiff in place of the requested surgery is quoted directly from

Mr. Connors' response as follows:

The knee replacement surgery was disapproved
with recommendation for conservative management
of the medical condition. In accordance with
Program Statement 6031.04, <u>Patient Care</u>, under
the Bureau Of Prisons scope of services, this
is an elective procedure and is considered
medically acceptable- not always necessary.
Your medical condition will continue to be
monitored and if your symptoms get worse, a
consultation will be resubmitted. At present,
there is insufficient diagnostic data to make a
clinical determination of the need for knee
replacement surgery

Plaintiff has included copies of Mr. Keller and Mr. Connors'

responses to his Administrative Remedies attached as "Exhibit C" so

that the Court may review them as proof of Plaintiff's factual

statements.

(1)G. The only reason provided to the Plaintiff that surgery

7

was not appropriate for his medical condition at the times requested was Program Statement 6031.04 Patient Care. The medical staff here at FCI Big Spring never attempted another method of medical care for Plaintiff's medical condition. Plaintiff did not talk with any Health Care Provider about any of this ever.

(2) Plaintiff does allege that he sustained physical injury as a result of not receiving surgery.

(2)A. Plaintiff fell down while coming up the north steps of the compound after going to the Health Services Unit for pill line and injured his right shoulder. Plaintiff has not had any medical care for this injury but still has pain from it all of the time in his shoulder. Plaintiff has an e-mail that he sent to T. Crnkovich on November 19, 2015 concerning this fall and the trouble he was having making it down to pill line every day. Plaintiff also informed Ms. Crnkovich that he needed the use of a walker to prevent him from having any more accidents, a request that she ultimately denied. Plaintiff has attached a copy of this electronic e-mail to this document as "Exhibit D" so that the Court may review it as proof of his factual statements.

(3)A. Plaintiff puts forth Program Statement 6031.04(8) to show that T. Crnkovich was personally involved in the decision to not provide surgery to him. Program Statement 6031.04(8) reads as follows:

> **Institution Utilization Review Committee-**
> **Program Statement 6031.04(8)**
> 8. Utilization Review. Every institution will
> have an established Utilization Review Committee
> (URC), chaired by the Clinical Director. Other
> members should include but not be limited to
> the: HSA or Assistant HSA; Medical Trip
> Coordinator; Health Care Provider(s) directly
> involved in the reviewed cases; Director Of
> Nursing (if applicable); a Chaplin or Social
> Worker.

The URC will review the following areas: Outside
medical, <u>surgical</u>, and dental procedures.

So, since T.Crnkovich is the HSA she was involved in the
decision to not provide Plaintiff surgery for his Osteoarthritis.
Ms. Crnkovich also denied Plaintiff the use of medical supplies (i.e.
a walker) so that he ended up falling and injuring his right shoulder.
Ms. Crnkovich had stated that only a Physician or Physician's
Assistant (PA) could issue a walker to an inmate. T. Crnkovich is
classified as a PA and could have issued Plaintiff a walker but
chose not to do so. The Orthopedic Surgeon recommended that Plaintiff
be given a walker, cane, and/or wheelchair as his symptoms wax and
wane in the normal progression of OA <u>this severe</u>. So, not having a
total knee replacement and walking bone on bone without a walker has
indeed inflicted pain and suffering to Plaintiff's well being.
Plaintiff has seen where Ms. Crnkovich has issued walkers to four
different inmates while still refusing to issue him one. Plaintiff
feels like he was singled out and also discriminated against by Ms.
Crnkovich with deliberate indifference to his serious medical needs.

(3)B. Plaintiff does not have any facts that show Myron L. Batts
was personally involved in the decision to not provide him total
knee replacement. But, on December 7, 2015, Myron L. Batts did deny
Plaintiff medical supplies (i.e. a walker) in writing in his answer
to Plaintiff's BP-9 Administrative Remedy. The Orthopedic Surgeon
recommended that the Plaintiff be supplied with a walker on November
5, 2015. The walker would have relieved some of the pressure off
Plaintiff's right knee and gave him support from "<u>falling again</u>."
So, not having a total knee replacement and walking without a walker
did indeed inflict pain and suffering to Plaintiff's well being.
Plaintiff had no personal interaction with Myron L. Batts.

9

(3)C. On January 6, 2016, J.A. Keller Regional Director, not a Regional Clinical Specialty Consultant or a Central Office Physician, responded to Plaintiff's BP-10 Administrative Remedy. In this document Mr. Keller stated that Plaintiff's total knee arthroplasty had been denied with a recommendation for conservative management. J.A. Keller also denied Plaintiff medical supplies (i.e. a walker) in this same document. Not having total knee arthroplasty or the use of a walker has inflicted pain and suffering to Plaintiff's well being. Plaintiff had no personal interactions with J.A. Keller.

(3)D. On March 14, 2016, Ian Connors Administrator National Inmate Appeals responded to Plaintiff's BP-11 Administrative Remedy. Plaintiff would like to inform the Court first that Mr. Connors has no kind of medical certification or pharmaceutical degree whatsoever. In this document (BP-11) Mr. Connors stated that Plaintiff's total knee arthroplasty had been denied and refered him back to Program Statement 6031.04 Patient Care. Mr. Connors stated, "At present, there is insufficient diagnostic data to make a clinical determination of the need for knee replacement surgery." Ian Connors also claimed that Gabapentin is clinically indicated for use in treating "neuritis or radiculitis" two conditions Plaintiff does not have. Mr. Connors also stated that Amitriptyline (Elavil) is clinically indicated for use in treating "Enthesopathy of the knee" a fact that is simply untrue. Gabapentin and Amitriptyline (Elavil) are not FDA or clinically approved for use in the treatment of Osteoarthritis of the knee at all. This fact is established in the drug information sheets attached to this document as "Exhibit E." So, due to Mr. Connors' denial in his response to Plaintiff's BP-11 Administrative Remedy, Plaintiff is still walking bone on bone causing pain and suffering

10

during his day to day activities. Plaintiff had no personal

interactions with Ian Connors.

(4) T. Crnkovich denied Plaintiff <u>Medical Supplies</u> (i.e. a

walker) that the Orthopedic Surgeon recommended. The Plaintiff had

been and still is walking bone on bone and a walker would have

relieved some of the pressure on his right knee relieving some of

the pain. Plaintiff requested the use of a walker through e-mails

to Ms. Crnkovich on November 5, 2015, November 10, 2015, November

11,2015, and November 19, 2015. In these e-mails Plaintiff told T.

Crnkovich that he fell and hurt his shoulder. See "Exhibits F and

D." Plaintiff wrote a BP-8 Administrative Remedy on Ms. Crnkovich.

T. Crnkovich made the following statements in her response to

Plaintiff's BP-8:

> According the Orthopedic surgeon notes you were
> told that this would not help your pain and he
> recommended and educated you on quad sets.

This statement was made in reference to the use of a walker which

is completely at odds with what the Orthopedic Surgeon said in his

assessment. In his assessment the Orthopedic Surgeon states:

> Discussed potential treatment options with patient
> and explained that the most predictable thing to
> offer is total knee replacement. Pt knows this
> will take a while and I've explained several times
> that his knee is very suspicious of a meniscus
> injury and that we can recommend an MRI and knee
> scope but this won't do a bit of good for the
> arthritis pain.

This statement in no way implies that a walker will not help relieve

Plaintiff's knee pain which is what Ms. Crnkovich is trying to imply.

A copy of Ms. Crnkovich's response to Plaintiff's BP-8 and the

Orthopedic Surgeon's examination report are attached to this document

as "Exhibit G" for the Court's inspection and as proof of Plaintiff's

factual statement. Through these actions T. Crnkovich shows that

11

she acted wantonly and with deliberate indifference to Plaintiff's serious medical needs.

Myron L. Batts also denied Plaintiff Medical Supplies (i.e. a walker) that the Orthopedic Surgeon recommended. Mr. Batts used the same erroneous excuse as Ms. Crnkovich to deny Plaintiff the use of a walker. This leads Plaintiff to believe that Mr. Batts did not read or review any of the information he was given for himself but instead had someone else do it for him possibly even Ms. Crnkovich herself. Indeed, Mr. Batts based everything that was written on nothing more than what he was told by T. Crnkovich. Mr. Batts denied Plaintiff the use of a walker in his response to Plaintiff's BP-9 Administrative Remedy. A copy of Mr. Batts' response to Plaintiff's BP-9 is attached to this document as "Exhibit H" for the Court's inspection and as proof of Plaintiff's factual statement. Myron L. Batts' denial of Plaintiff's request for a walker caused him serious harm in his day to day activities and still does. Through these actions Myron L. Batts shows that he acted wantonly and with deliberate indifference to Plaintiff's serious medical needs.

J.A. Keller denied Plaintiff Medical Supplies (i.e. a walker) and knee replacement surgery both which the Orthopedic Surgeon recommended. This was done in Mr. Kellers response to Plaintiff's BP-10 Administrative Remedy. If Mr. Keller read all the facts contained in the medical records and still denied Plaintiff the treatment he requested then surely he acted in a wanton manner. The facts were right there in Mr. Keller's face, walking bone on bone, total knee replacement ASAP, but he still denied Plaintiff his knee replacement and medical supplies. A copy of J.A. Keller's response to Plaintiff's BP-10 is attached to this document as "Exhibit C" for

the Court's inspection and as proof of Plaintiff's factual statement. Mr. Keller's denial of Plaintiff's request for a walker and knee replacement surgery caused him serious harm in his day to day activities and still does. Through these actions J.A. Keller shows that he acted wantonly and with deliberate indifference to Plaintiff's serious medical needs.

Ian Connors denied Plaintiff knee replacement surgery which the Orthopedic Surgeon recommended. This was done in Mr. Connors' response to Plaintiff's BP-11 Administrative Remedy. In his response Mr. Connors states:

> The record reflects you have received medical care and treatment in accordance with evidence based standard of care and within the scope of services of the Federal Bureau Of Prisons.

But, Mr. Connors also stated in this same response:

> At present, there is insufficient diagnostic data to make a clinical determination of the need for knee replacement surgery.

So, which is it? Plaintiff would like to state once again that Ian Connors has no kind of medical certification or pharmaceutical degree neither is he a Central Office Physician who would be qualified to give such a determination. Yet, Mr. Connors denied Plaintiff's request for knee surgery. Mr. Connors denied Plaintiff total knee replacement just because he either did or did not have all of the facts and was underqualified to make such a determination at any length. A copy of Ian Connors' response to Plaintiff's BP-11 is attached to this document as "Exhibit C" for the Court's inspection and as proof of Plaintiff's factual statement. Mr. Connors' denial of Plaintiff's request for knee replacement surgery caused him serious harm in his daily activities and still does. Through these actions

13

Ian Connors shows that he acted wantonly and with deliberate indifference to Plaintiff's serious medical needs.

(5) Plaintiff bases his naming the Bureau Of Prisons as a Defendant on the doctrine of vicarious liability and respondeat superior. Vicarious liability is liability that a supervisory party (such as an employer) bears for the actionable conduct of a subordinate or associate (such as an employee) based on the relationship between the two parties. Bryan A. Garner, Black's Law Dictionary Ninth Edition 998 (Thomson/West Publishing 2009). Respondeat superior is the doctrine holding an employer or principal liable for the employee's or agent's wrongful acts committed within the scope of the employment or agency.-- Also termed master-servant rule. Bryan A. Garner, Black's Law Dictionary Eighth Edition 1338 (Thomson/West Publishing 2004). Since all of the Defendant's are employees of the Bureau Of Prisons Plaintiff intends to recover using these two legal principles.

(6) The monetary damages are compensatory damages. Plaintiff estimates that $20,000 is what it will cost him to have the knee replacement surgery if it is not awarded by the Court.

(7) Plaintiff is and has been in a tremendous amount of pain just in performing his normal day to day activities. It is Plaintiff's understanding that there is no cartilage left in his knee joint and it is continually rubbing bone on bone as he walks. Plaintiff is being forced to walk on a nonfunctioning joint and bear the pain and suffering of a choice that the Defendant's have made for him. Maybe a $2,000,000 penalty will discourage others in positions of power not to act so calously toward their fellow human beings.

Respectfully submitted,

14

Dated: July 23, 2017                              By: _____
                                                 Robert Alan Thompson, Pro Se
                                                 Register# 17709-280
                                                 FPC Big Spring
                                                 1900 Simler Avenue
                                                 Big Spring, Texas 79720


## VERIFICATION

I, Robert Alan Thompson, verify under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct. Executed this 23rd day of July, 2017.


                                                 By: _____
                                                 Robert Alan Thompson, Pro Se
                                                 Register# 17709-280
                                                 FPC Big Spring
                                                 1900 Simler Avenue
                                                 Big Spring, Texas 79720


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing Plaintiff's More Definite Statement has been mailed first class postage prepaid on this 23rd day of July, 2017, to the Clerk Of The Court, Keren Mitchell, 341 Pine Street, Rm. 2008, Abilene, Texas 79601. Executed under penalty of perjury pursuant to 28 U.S.C. § 1746, on this 23rd day of July, 2017.


                                                 By: _____
                                                 Robert Alan Thompson, Pro Se
                                                 Register# 17709-280
                                                 FPC Big Spring
                                                 1900 Simler Avenue
                                                 Big Spring, Texas 79720


15

Robert Alan Thompson
#17709-280
Federal Correctional Institution
1900 Simler Ave.
Big Spring, Texas 79720

PRIORITY MAIL

★ TRACKED ★ INSURED ★

UNITED STATES POSTAL SERVICE®

For Domestic Use Only

Label 107R, July 2013

Expected Delivery Day: 07/29/2017

USPS TRACKING NUMBER

9505 5142 0401 7208 1189 93

X-RAY

◇17709-280◇
U S District Court
Clerk United States Post
Office and Courthouse
341 Pine Street, Rm. 2008
Abilene, TX 79601
United States

UNITED STATES POSTAL SERVICE®

1006

79601

U.S. POSTAGE
PAID
BIG SPRING, TX
79720
JUL 27, 17
AMOUNT
$0.00
R2304N116921-02

RECEIVED
JUL 28 2017
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS



FEDERAL CORRECTIONAL INSTITUTION
BIG SPRING, TEXAS 79720-0001

DATE 7/22/15

The enclosed letter was processed through special mailing procedures for forwarding to you. The letter has been neither opened nor inspected. If the writer raises a question or problem over which this facility has jurisdiction, you may wish to return this material for further information or clarification. If the writer encloses correspondence for forwarding to another, please use the enclosed envelope or address.