UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
ABILENE DIVISION

ROBERT ALAN THOMPSON
Fed. Reg. #17709-280,
   Plaintiff,
v.

T. CRNKOVICH
Health Services Administrator,
FPC Big Spring.
   Defendant.

Civil Action No. 1:16-CV-55-BL
ECF

**BRIEF IN SUPPORT OF**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

ERIN NEALY COX
UNITED STATES ATTORNEY

ANN E. CRUCE-HAAG
Assistant United States Attorney
Texas Bar No. 24032102
1205 Texas Avenue, Suite 700
Lubbock, Texas 79401
Telephone: (806) 472-7351
Facsimile: (806) 472-7394
Email: ann.haag@usdoj.gov

Attorneys for Defendant

TABLE OF CONTENTS

I.   SUMMARY ................................................................................................. 1

II.  FACTUAL BACKGROUND ..................................................................... 2

III. LEGAL STANDARDS ........................................................................... 13

     A.  Summary Judgment. ..................................................................... 13

     B.  Qualified Immunity. ...................................................................... 14

IV.  ARGUMENT AND AUTHORITY .......................................................... 17

     A.  This Court Lacks Personal Jurisdiction Over Defendant Crnkovich .................. 17

     B.  Defendant Crnkovich is entitled to qualified immunity, and is therefore entitled
         to summary judgment in her favor. ................................................................. 20

V.   CONCLUSION ...................................................................................... 27

## TABLE OF AUTHORITIES

Cases

*Anderson v. Creighton*,
    483 U.S. 635 (1987) ................................................................. 14, 15

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ..................................................................... 13

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ........................................................... 14, 15, 16

*Bazan v. Hidalgo County*,
    246 F.3d 481 (5th Cir. 2001) ......................................................... 13

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) ..................................................................... 16

*Brewster v. Dretke*,
    587 F.3d 764 (5th Cir. 2009) ......................................................... 20

*Brown v. Callahan*,
    623 F.3d 249 (5th Cir. 2010) ................................................... 15, 17

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ............................................................... 13, 14

*Collier v. Montgomery*,
    569 F.3d 214 (5th Cir. 2009) ......................................................... 15

*Davis-Wilson v. Hilton Hotels Corp.*,
    106 F.R.D. 505 (E.D. La. 1985) ..................................................... 19

*Estelle v. Gamble*,
    429 U.S. 97 (1976) ....................................................................... 16

*Fox v. Mississippi*,
    2012 WL 3154971 (S.D. Miss. Aug. 2, 2012) ............................... 19

*Garret v. Susler*,
    2018 WL 1192996 (E.D. Tex. Mar. 7, 2018) ........................... 24, 26

*Gentilello v. Rege*,
    627 F.3d 540 (5th Cir. 2010) ......................................................... 15

*Gobert v. Caldwell,*
    463 F.3d 339 (5th Cir. 2006), ....................................................................... 20

*Hare v. City of Corinth,*
    135 F.3d 320 (5th Cir. 1998) ......................................................................... 17

*Harlow v. Fitzgerald,*
    457 U.S. 800 (1982) ....................................................................................... 14

*Hunter v. Bryant,*
    502 U.S. 224 (1991) ....................................................................................... 15

*Kersh v. Derozier,*
    851 F.2d 1509 (5th Cir.1988) ......................................................................... 19

*Little v. Liquid Air Corp.,*
    37 F.3d 1069 (5th Cir. 1994) ......................................................................... 14

*Malley v. Briggs,*
    475 U.S. 335 (1986) ....................................................................................... 14

*McCormick v. Stalder,*
    105 F.3d 1059 (5th Cir. 1997) ....................................................................... 16

*McNeil v. United States,*
    508 U.S. 106 (1993) ....................................................................................... 19

*Mississippi Publishing Corp. v. Murphree,*
    326 U.S. 438 (1946) ....................................................................................... 17

*Mitchell v. Forsyth,*
    472 U.S. 511 (1985) ....................................................................................... 14

*Morris v. Livingston,*
    739 F.3d 740 ................................................................................................... 20

*Omni Capital International, Ltd v. Rudolph Wolff & Co.,*
    484 U.S. 97 (1987) ......................................................................................... 17

*Pearson v. Callahan,*
    555 U.S. 223 (2009) ....................................................................................... 14

*Rochon v. Dawson,*
    828 F.2d 1107 (5th Cir.1987) ......................................................................... 19

*Ruiz v. Estelle,*
  679 F.2d 1115 (5th Cir. 1982) ........................................................................ 16

*Varnado v. Lynaugh*,
  920 F.2d 320 (5th Cir. 1991) .......................................................................... 16

*Way v. Mueller Brass Co.*,
  840 F.2d 303 (5th Cir. 1988) .......................................................................... 17

Rules

Fed. R. Civ. P. 4(e) ................................................................................... 18, 19

Fed. R. Civ. P. 4(i)(1) ..................................................................................... 18

Fed. R. Civ. P. 4(i)(3) ..................................................................................... 18

Fed. R. Civ. P. 12(b)(2) ................................................................................... 19

Fed. R. Civ. P. 12(b)(5) ..................................................................................... 1

Fed. R. Civ. P. 56(a) ....................................................................................... 13

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
ABILENE DIVISION

| | |
|---|---|
| ROBERT ALAN THOMPSON<br>Fed. Reg. #17709-280,<br>        Plaintiff,<br>v.<br><br>T. CRNKOVICH<br>Health Services Administrator,<br>FPC Big Spring.<br>        Defendant. | Civil Action No. 1:16-CV-55-BL<br>ECF |

**BRIEF IN SUPPORT OF**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Defendant files this Brief in Support of its Motion for Summary Judgment, and would show the Court as follows:

## I.   SUMMARY

Plaintiff, Robert Alan Thompson, is a federal inmate currently incarcerated at FCI Big Spring.  Plaintiff's complaint seeks to allege that he was subjected to cruel and unusual punishment in violation of the Eight Amendment by denying him adequate care for knee problems.  In his March 28, 2018, 7(a)(7) reply, Plaintiff alleges that Defendant Crnkovich improperly refused to issue him a walker and was responsible for a delay in him being seen by a doctor.

Defendant Crnkovich requests dismissal due to insufficient service of process. Fed. R. Civ. P. 12(b)(5).  Plaintiff seeks to assert claims against this defendant in her individual capacity; as such, he must comply with the federal rules' service requirements

for individual defendants.  Because this defendant has not been properly served, the Court lacks *in personam* jurisdiction over her.

Additionally, Plaintiff has pled insufficient facts to overcome this defendant's plea of qualified immunity, and Plaintiff therefore fails to state a *Bivens* claim for which relief may be granted.   The facts pled by Plaintiff, along with the medical records attached to his complaint, fail to demonstrate deliberate indifference to a serious medical need, and therefore do not adequately allege an Eighth Amendment violation.

For the foregoing reasons, Defendant Crnkovich seeks dismissal of Plaintiff's complaint in its entirety, as to any and all claims asserted against her therein and an award of such further relief to which they may be entitled.

## II.   FACTUAL BACKGROUND

Plaintiff has a history of knee problems dating from his admission to BOP custody in 2009.  After Plaintiff was convicted and sentenced in the Western District of Texas in 2009, the BOP initially assigned him to FCI Three Rivers, a medium security BOP facility located in Three Rivers, Texas.  Appx. p. 1225.  He arrived at FCI Three Rivers on July 8, 2009.  Appx. p. 1226.  Upon Plaintiff's arrival, an FCI Three Rivers mid-level provider (MLP) conducted a health screen, during which Plaintiff reported he had chronic arthritis.  Appx. p. 68.  The MLP did not document which of Plaintiff's joints were affected by this condition.

On July 20, 2009, a different FCI Three Rivers MLP conducted Plaintiff's physical examination.  The MLP recorded Plaintiff's height as 177.8 centimeters and his

weight as 100.2 kilograms.  Appx. p. 54.  This corresponds to a BMI of 31.7.[1]  The MLP noted that both of Plaintiff's legs had full range of motion (ROM), but also noted both Plaintiff's knees were mildly swollen, tender to palpation, and had slightly limited range of motion.  Appx. p. 59.  The MLP ordered knee x-rays.  Appx. p. 62.  The x-rays revealed a normal left knee and a post-patellar osteoarthritic spur in Plaintiff's right knee. Appx. p. 49.  As a consequence of Plaintiff's report of knee pain, Plaintiff's physical manifestations of joint deformity, and the x-ray results, on July 31, 2009, an FCI Three Rivers physician requested a consultation with an orthopedic surgeon.  Appx. p. 39.

On August 7, 2009, Plaintiff reported to sick call, reported his knees were "locking up on me," and requested knee braces.  Appx. p. 31.  An MLP evaluated Plaintiff and issued him knee braces and a cane.  Appx. pp. 31; 88.  A contract orthopedist evaluated Plaintiff on August 14, 2009, and diagnosed Plaintiff with right knee patellofemoral syndrome.[2]  Appx. p. 29.  The orthopedist injected Plaintiff's right knee with kenalog (a synthetic corticosteroid) and lidocaine (a numbing agent) and recommended continued use of knee braces, symptomatic treatment and a follow-up evaluation in three months. Appx. pp. 28-9.  On October 8, 2009, an FCI Three Rivers MLP prescribed capsaicin

---

[1] According to the Centers for Disease Control, when calculated using metric measurement, BMI is derived by dividing a person' weight in kilograms by the square of the person's height in meters.  *See* https://www.cdc.gov/healthyweight/assessing/bmi/index.html.

[2] According to the American Association of Orthopedic Surgeons, patellofemoral syndrome is a broad term used to describe pain in the front of the knee and around the patella, or kneecap.  Contributing factors to development of patellofemoral syndrome include problems with kneecap alignment and overuse from vigorous athletics or training.  Symptoms are often relieved with conservative treatment.  *See* https://orthoinfo.aaos.org/en/diseases--conditions/patellofemoral-pain-syndrome/.

cream for Plaintiff's knee pain and provided patient education on knee straightening exercises as tolerated.  Appx. p. 25.

During an evaluation by an FCI Three Rivers physician on November 2, 2009, Plaintiff reported that his right knee was better, but stated his left knee and hip were hurting.  Appx. p. 16.  Plaintiff's weight had decreased to 95.3 kilograms, yielding a BMI of 30.1.  Appx. p. 17.  The physician provided Plaintiff patient education regarding daily walking and diet and weight loss guidelines, and requested scheduling of a follow-up in three months.  Appx. p. 17.

Plaintiff was transferred from FCI Three Rivers to FCI Big Spring, where he arrived on November 20, 2009.  Appx. p. 1226.  During a health screening by an FCI Big Spring nurse that day, Plaintiff reported pain in both of his knees and his left hip.  Appx. p. 7.  The nurse contacted an FCI Big Spring physician, who verbally ordered renewal of Plaintiff's capsaicin prescription.  Appx. p. 9.

Plaintiff was scheduled for a January 19, 2010 appointment with an FCI Big Spring physician, but failed to report for the appointment.  Appx. p. 211.  The physician ultimately evaluated Plaintiff at a February 3, 2010 appointment.  Appx. p. 204.  His weight had increased to 100.2 kilograms.  Appx. p. 205.  This increased his BMI to 31.7.  The physician renewed Plaintiff's capsaicin prescription and requested scheduling of a follow-up in three months.  Appx. pp. 206-07.

On February 8, 2010, an FCI Big Spring physician's assistant evaluated Plaintiff for complaints of left leg and hip pain, right knee pain, and dizziness and headaches.  Appx. p. 203.  The physician's assistant ordered x-rays of Plaintiff's hips and lumbar

spine and sent Plaintiff back to his housing unit to convalesce.  Appx. pp. 199; 202.

Plaintiff's lumbar spine and hip x-rays were negative for abnormal results.  Appx. p. 197.

On March 5, 2010, an FCI Big Spring MLP evaluated Plaintiff for a complaint of left knee pain.  Appx. p. 184.  The LMP ordered a left knee x-ray, issued Plaintiff Ace bandages for both knees and instructed Plaintiff to follow-up at sick call as needed.  Appx. p. 184.  Plaintiff's left knee x-ray was negative for abnormal results except for degenerative joint disease.  Appx. p. 183.

An FCI Big Spring physician evaluated Plaintiff on May 13, 2010.  Appx. p. 176.  His weight had increased to 101.6 kilograms.  Appx.  p. 177.  This increased his BMI to 32.1.  The physician renewed Plaintiff's capsaicin prescription.  Appx. p. 178.

During an evaluation on July 27, 2010, an FCI Big Spring MLP noted Plaintiff's weight as 96.6 kilograms.  Appx. p. 143.  This decreased his BMI to 30.5.  During an evaluation on January 14, 2011, an FCI Big Spring physician noted Plaintiff's weight as 94.3 kilograms.  Appx. p. 293.  This decreased his BMI to 29.8

During a July 22, 2011 evaluation by an FCI Big Spring MLP, Plaintiff complained of left knee pain.  Appx. p. 252.  Plaintiff's weight had decreased to 88.5 kilograms.  Appx. p. 253.  This decreased Plaintiff's BMI to 27.9.  The MLP ordered a left knee x-ray and issued an orthopedic surgery consultation request.  Appx. p. 254.  The left knee x-ray revealed mild degenerative joint disease, patellar spurring, and joint space loss.  Appx. p. 250.

During a sick call encounter, Plaintiff requested a steroid injection for his knee pain.  Appx. * [page 8 of 2011 BEMR].  He was scheduled for a 2:00 p.m. appointment

on September 8, 2011, but he did not report for the appointment.  Appx. p. 246.  A

contract orthopedic surgeon evaluated Plaintiff on September 19, 2011.  Appx. p. 245.

Plaintiff complained of knee pain, swelling, crepitation (*i.e.*, crunching or popping),

locking, "and difficulty."  Appx. p. 244.  The surgeon noted good knee alignment and no

knee instability, but did note crepitation, pain on direct pressure, and pain on flexion and

extension.  Appx. p. 244.  The surgeon diagnosed degenerative arthritis, recommended

prescription of the nonsteroidal anti-inflammatory drug meloxicam for pain and swelling,

and recommended a follow-up evaluation in eight weeks.  Appx. p. 244.  An FCI Big

Spring physician prescribed meloxicam as recommended.  Appx. p. 243.

     Plaintiff had a follow-up evaluation with the orthopedic surgeon on October 17,

2011.  Appx. p. 240.  The surgeon noted Plaintiff still had a pop in his knee, but had been

doing better since his prior knee injection.  Appx. p. 240.  The surgeon also noted

Plaintiff's knee had good flexion and extension, with no instability, and stated he would

see Plaintiff on an as needed basis.  Appx. p. 240.

     The contract orthopedic surgeon evaluated Plaintiff again on February 13, 2012.

Appx. p. 387.  Plaintiff reported meloxicam "has not really helped out."  Appx. p. 387.

The surgeon noted Plaintiff's prior right knee injection had "helped out his knee quite a

bit," but that Plaintiff was now reporting increasing pain and difficulty in flexion and

extension of his left knee.  Appx. p. 387.  The surgeon suggested a left knee injection.

Appx. p. 387.  The FCI Big Spring URC approved a consultation appointment with the

orthopedic surgeon for the recommended injection.  Appx.  p. 382.  The orthopedic

surgeon administered the injection on May 17, 2012.  Appx.  p. 374.

On July 5, 2012, an FCI Big Spring physician's assistant changed Plaintiff's pain medication from meloxicam to indomethacin, another nonsteroidal anti-inflammatory medication.  Appx. p. 364.  On July 26, 2012, the physician's assistant added gabapentin, a medication for nerve pain, to Plaintiff's medication regimen.  Appx. p. 361.  On August 23, 2012, Plaintiff reported gabapentin was not helping his pain and requested discontinuation of this medication.  Appx. p. 355.  An MLP discontinued gabapentin and prescribed amitriptyline, a tricyclic antidepressant which is also commonly used to treat nerve pain.  Appx. p. 356.  On August 30, 2012, an FCI Big Spring physician discontinued indomethacin and resumed meloxicam, as the orthopedic surgeon previously recommended.[3]  Appx. p. 359.

On October 24, 2012, Plaintiff reported to an FCI Big Spring MLP that amitriptyline was not helping with his pain.  Appx. p. 345.  The MLP noted that despite a recently-diagnosed heel spur and complaints of pain, Plaintiff was walking without a limp.  Appx. p. 345.  The MLP increased Plaintiff's amitriptyline dosage and instructed Plaintiff to return to sick call is his condition did not improve.  Appx. p. 346.

On November 1, 2012, Plaintiff again complained of ineffectiveness of his medications.  Appx. p. 341.  A physician's assistant again increased Plaintiff's amitriptyline dosage.  Appx. p. 342.  On December 5, 2012, the physician's assistant noted Plaintiff had been non-compliant with taking amitriptyline and discontinued

---

[3] Although the note regarding discontinuing indomethacin and resuming meloxicam is dated July 30, 2012, it does not appear that the physician entered the note until August 30, 2012.  Appx. * [page 27 of 2012 BEMR].  Therefore, it appears that this medication change was not implemented until August 30, 2012.

Plaintiff's prescription for this medication.  Appx. p. 333.  On March 5, 2013, Plaintiff requested ibuprofen for pain instead of meloxicam.  Appx. p. 475.  The nurse who saw Plaintiff on that date contacted a physician, who verbally ordered an ibuprofen prescription.  Appx. p. 475. On April 2, 2013, a physican's assistant substituted naproxen for ibuprofen.  Appx. p. 473.

On May 2, 2014, an MLP resumed an amitriptyline prescription after Plaintiff complained of back pain.  Appx. p. 600.  The MLP increased Plaintiff's amitriptyline dosage on May 29, 2014.  Appx. p. 597.  A physician resumed a gabapentin prescription on August 6, 2014.  Appx. p. 588.  At the time, Plaintiff's weight was 103 kilograms. Appx. p. 586.  This increased Plaintiff's BMI to 32.6.

Plaintiff refused gabapentin on October 22, 2014.  On December 1, 2014, an FCI Big Spring nurse evaluated Plaintiff for a complaint of chest pain when inhaling.  Appx. p. 559.  The nurse consulted with an MLP, who ordered discontinuation of naproxen and resumption of indomethacin.  Appx.  p. 560.

On January 11, 2015, an FCI Big Spring nurse noted Plaintiff had been non-compliant with his gabapentin prescription.  Appx. p. 820.  The nurse consulted with the Regional Medical Director, who verbally ordered discontinuation of Plaintiff's gabapentin prescription.  Appx. p. 820.  On July 28, 2015, an FCI Big Spring nurse evaluated Plaintiff for complaints of right knee locking and neck pain.  Appx. p. 740. The nurse consulted with the Regional Medical Director, who verbally ordered resumption of a gabapentin prescription.  Appx. p. 741.

On July 31, 2015, an FCI Big Spring nurse evaluated Plaintiff, who complained "My neck is killing me and my right knee is giving me a lot of trouble walking."  Appx. p. 737.  The nurse ordered a right knee x-ray and issued Plaintiff a cane.  Appx. p. 737. The x-ray revealed moderate degenerative joint disease, with degenerative change most marked in the patellofemoral compartment[4] and intra-articular bodies (loose fragments of cartilage).  Appx. p. 734.

On August 10 2015, an FCI Big Spring nurse evaluated Plaintiff for a complaint of increased knee pain and difficulty walking down stairs.  Appx. p. 717.  The nurse noted Plaintiff appeared to be in pain, had a guarded gait, and had a decreased range of right knee motion, with crepitus, popping and locking.  Appx. p. 718.  The nurse consulted with a physician's assistant, who ordered a "lay in" (*i.e.*, convalescence) and instructed the nurse to prepare a request for consultation with an orthopedic surgeon.  Appx. p. 719.

On September 3, 2015, Plaintiff complained gabapentin was "not being very effective."  Appx. p. 711.  He also reported he was out of naproxen.  Appx. p. 711.  The nurse who evaluated Plaintiff consulted with an MLP and the Regional Medical Director, who prescribed meloxicam and amitriptyline.  Appx. p. 713.

A contract orthopedic surgeon evaluated Plaintiff on November 5, 2015.  Appx. p. 685.  The surgeon's assessment was severe osteoarthritis of the right knee and noted: Discussed potential treatment options with patient and explained that the most predictable

---

[4] A normal human knee joint is composed of three compartments:  the patellofemoral compartment, the medial compartment, and the lateral compartment.  The patella femoral compartment is at the front of the knee between the patella (knee cap) and femur (thigh bone).  The medial compartment is near the middle of the knee joint on the inner side.  The lateral compartment is near the middle of the knee joint on the outer side.

**Brief in Support of Defendant's Motion for Summary Judgment – Page 9**

thing to offer is a total knee replacement.  Pt knows this will take a while and I've explained several times that his knee is very suspicious of a meniscus injury and that we can recommend an MRI and knee scope but this won't do a bit of good for the arthritis pain.  Pt thinks the majority of his pain is from the arthritis.  Discussed pros and cons of a knee replacement, pt wishes to proceed and his daily symptoms, lack of mobility, and extreme arthrosis on the xray certainly qualify him for a surgery such as this.  Discussed ways to treat his pain while we're waiting on the TKA to get approved, pt wants to try another cortisone injection, his last one was in 2009 and it lasted 6 months. Appx. pp. 687-88.

The surgeon administered an injection of the steroid celestone and educated Plaintiff on performing quad set exercises.  Appx. p. 688.  The surgeon also recommended a total knee arthroplasty (*i.e.*, knee joint replacement) as soon as possible, and recommended that Plaintiff "be allowed to use a walker, cane, and/or wheelchair as his symptoms wax and wane in the normal progression of [osteoarthritis] this severe."  Appx.  p. 688.

FCI Big Spring received the surgeon's report on November 30, 2015, (Appx. pp. 689-90) and a consultation request for the recommended surgery was completed on December 1, 2015.  Appx. pp. 667; 1142.  On December 3, 2015, the URC, of which Defendant Crnkovich is a member, referred the consultation request to the Regional Office in accordance with the BOP's clinical practice guidelines.  Appx. p. 1143.  On December 29, 2015, the Regional Medical Director disapproved the consultation request, noting that Plaintiff did not currently meet clinical practice guideline criteria for surgical

intervention.  Appx. p. 1143.  The Regional Medical Director noted Plaintiff's BMI at the

time was 32.6, and recommended conservative management of Plaintiff's condition,

including weight loss to a BMI closer to 25, as specified in the clinical practice guideline

criteria.  Appx. p. 1143.

On March 9, 2016, an FCI Big Spring MLP noted Plaintiff had not been reporting

to pill line for his medications.  Appx. pp. 953-54.* [page 76 of 2015 BEMR].  Therefore,

the MLP discontinued Plaintiff's amitriptyline and gabapentin prescriptions.  Appx. p.

953.  A physician evaluated Plaintiff on April 20, 2016.  Appx. pp. 940-43.  His sole

documented orthopedic/rheumatologic complaint related to back problems.  Appx. p.

940.  The record reflects no indication Plaintiff sought medical attention for his knee

problems during this evaluation.

Plaintiff next complained of knee problems during an evaluation by an FCI Big

Spring nurse on March 31, 2017.  Appx. p. 1078.  Specifically, he complained of left

knee pain, popping, grinding and locking.  Appx. p. 1078.  After evaluation, the nurse

ordered a left knee x-ray.  Appx. p. 1079.  The x-ray revealed minimal osteoarthritis in

the patellofemoral compartment and a tine enthesophyte (abnormal bony projection) at

the insertion point of the quadriceps ligament.  Appx. p. 1076.  On April 18, 2017, four

days after returning to the institution from neck surgery performed in a community

hospital, Plaintiff told an FCI Big Spring nurse he wanted knee replacement.  Appx. p.

1043.  The nurse told Plaintiff the minimally arthritic condition of his left knee did not

meet criteria for joint replacement surgery.  Appx. p. 1043.

A physician evaluated Plaintiff on September 27, 2017.  Appx. p. 1024.  Among other things, Plaintiff complained of knee pain that was affecting his ability to walk. Appx. p. 1025.  Plaintiff's weight had increased to 103.4 kilograms.  Appx. p. 1026.  This increased his BMI to 32.7.  The physician noted Plaintiff's gait was not normal, and his knees were tender and had decreased range of motion.  Appx. p. 1028.  The physician ordered x-rays of both knees, and requested consultations for physical therapy and magnetic resonance imaging (MRI) studies of both knees.  Appx. p. 1030.

Plaintiff's right knee x-ray revealed mild narrowing of the medial compartment, with mild osteophyte (abnormal bony projection) formation.  Appx. p. 1021.  The x-ray also revealed an ossific (*i.e.*, bony) density adjacent to the tibial plateau (top of the shin bone).  Appx. p. 1021.  The radiologist who interpreted the x-ray opined this was either an accessory sesamoid[5] or possibly a loose body.  Appx. pp. 1020-21.  The radiologist also noted the presence of a fabella (sesamoid embedded in the tendon of the lateral (outside) head of one of the calf muscles).  Appx. pp. 1020-21.  Plaintiff's left knee x-ray revealed minimal marginal osteophyte formation and a fabella.  Appx. pp. 1020-21.

Plaintiff's right knee MRI revealed degenerative thinning of the articular cartilage (cartilage that covers the end of bones where they come together to form a joint and which allows the bones to glide over each other with little friction), a complex medial (inside) tear of the meniscus (cartilage between the femur and tibia), and mild

---

[5] A sesamoid is a small independent bone or bony nodule embedded within a tendon where the tendon passes over an angular structure.  The patella (kneecap) is an example of a particularly large sesamoid.  An accessory sesamoid is a sesamoid that is not normally present in the body, but can be found in a number of people.

chondromalacia patella (softening and breakdown of the cartilage under the kneecap).

Apx. pp. 1004-007.  Plaintiff's left knee MRI revealed normal articular cartilage for

Plaintiff's age, with no evidence of chondromalacia patella or meniscal cartilage tear.

Appx. pp. 1004-007.  The radiologist also noted Plaintiff's anterior cruciate ligament was

either mildly sprained or partially torn.  Appx. pp. 1004-007.  On February 7, 2018, an

FCI Big Spring MLP issued a consultation request for an orthopedic surgeon to evaluate

Plaintiff's MRI results and advise regarding the recommended course of care.  Appx. p.

1121.

### III.    LEGAL STANDARDS

A. Summary Judgment.

When the record establishes "that there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law," summary judgment is

appropriate.  Fed. R. Civ. P. 56(a).  An issue is considered "genuine" if it is "real and

substantial, as opposed to merely formal, pretended, or a sham." *Bazan v. Hidalgo

County*, 246 F.3d 481, 489 (5th Cir. 2001).  Facts are considered "material" only if they

"might affect the outcome of the suit under the governing law." *Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 248 (1986).

To prevail on a motion for summary judgment, the moving party has the initial

burden of demonstrating that there is no genuine issue as to any material fact and that it is

entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

(1986).  Once the movant has done so, the non-moving party must go beyond the

pleadings and by his own evidence set forth specific facts showing there is a genuine

issue for trial.  *Id.*, 477 U.S. at 324.  This burden is not satisfied by creating some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

B.  Qualified Immunity.

In individual capacity suits, "qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not clearly violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Individual capacity suits "can entail substantial costs."  *Anderson v. Creighton*, 483 U.S. 635, 638 (1987).  These costs include not only "the deterrence of able citizens from acceptance of public office," *Harlow*, 457 U.S. at 814, but also "the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties," *Anderson*, 483 U.S. at 638.  The doctrine of qualified immunity is designed to minimize these costs.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 685 (2009); *Anderson*, 483 U.S. at 638; *Harlow*, 457 U.S. at 814.

The protection afforded by qualified immunity is accordingly "ample."  *Malley v. Briggs*, 475 U.S. 335, 341 (1986).  The doctrine provides "ample room for mistaken judgments" and protects all government officials except "the plainly incompetent or those who knowingly violate the law."  *Id*.  Moreover, qualified immunity is immunity from suit rather than a mere defense to liability.  *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

As a consequence, questions of qualified immunity should be resolved at the earliest possible stage in litigation. *Hunter v. Bryant*, 502 U.S. 224, 227 (1991).

Deciding a summary judgment motion based on qualified immunity involves answering two questions, either of which a court may address first. *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010), *cert.* denied, 563 U.S. 651 (2011). The court must determine whether the defendant's conduct violated a plaintiff's constitutional right. *Id*. If not, the defendant is immune. The court must also determine whether the right was "clearly established." *Id*. For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson*, 483 U.S. at 460. Although "the very action in question" need not have been previously held unlawful, "in the light of pre-existing law the unlawfulness must be apparent." *Id*. Essentially, to overcome qualified immunity, a plaintiff must show that "no reasonable officer could have believed his actions were proper." *Brown*, 623 F.3d at 253.

"Although nominally an affirmative defense, the plaintiff has the burden to negate the assertion of qualified immunity once properly raised." *Collier v. Montgomery*, 569 F.3d 214, 217 (5th Cir. 2009). At this stage, Plaintiff must allege facts demonstrating the violation of a constitutional right, and that the right was "clearly established" at the time of Defendants' alleged misconduct. *Gentilello v. Rege*, 627 F.3d 540, 544 (5th Cir. 2010). A complaint that fails to plead sufficient facts demonstrating a defendant's violation of a clearly established constitutional right is subject to dismissal. *Iqbal*, 556 U.S. at 666, 680-83. Conclusory allegations, or allegations that amount to nothing more

than a formulaic recitation of the elements of a constitutional claim are insufficient. *Id*. at 681 (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 554-55 (2007)).

Even more fundamentally, a plaintiff seeking to recover damages for claims of constitutional violations must also assert facts demonstrating an individual defendant's actual participation in the alleged wrongful conduct. "Because vicarious liability is inapplicable to *Bivens* and [42 U.S.C.] § 1983 suits, a plaintiff must plead that each government-official defendant, through the defendant's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676.

To demonstrate an Eighth Amendment violation for the denial of medical care, a prisoner must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106 (1976). "Deliberate indifference encompasses only unnecessary and wanton infliction of pain repugnant to the conscience of mankind." *McCormick v. Stalder,* 105 F.3d 1059, 1061 (5th Cir. 1997). Therefore, not every claim of inadequate or improper medical treatment is a violation of the Constitution. *Estelle*, 429 U.S. at 105-07. For example, complaints of negligence, neglect, unsuccessful treatment, or even medical malpractice do not give rise to constitutional claims. *Varnado v. Lynaugh*, 920 F.2d 320, 321 (5th Cir. 1991). *See also Ruiz v. Estelle,* 679 F.2d 1115, 1149 (5th Cir. 1982) ("Neither inadvertent failure to provide adequate medical care, nor carelessness, nor even deliberate failure to conform to the standards suggested by experts is cruel and unusual punishment.") (footnote omitted).

Here, *Bivens* Defendant Crnkovich has invoked qualified immunity as a defense to Plaintiff's *Bivens* claims.  The test for qualified immunity is well established:  "(1) whether the plaintiff has alleged a violation of a clearly established constitutional right; and (2) if so, whether the defendant's conduct was objectively unreasonable in light of the clearly established law at the time of the incident."  *Hare v. City of Corinth*, 135 F.3d 320, 325 (5th Cir. 1998).  Plaintiff bears the burden of rebutting the defense of qualified immunity, and the *Bivens* Defendant is entitled to prevail if Plaintiff fails to satisfy either prong.  *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010).

## IV. ARGUMENT AND AUTHORITY

### A.  This Court Lacks Personal Jurisdiction Over Defendant Crnkovich

Before a court may exercise personal jurisdiction over a defendant, there must be more than notice to the defendant.  The procedural requirements of service of summons pursuant to Rule 4 of the Federal rules of Civil Procedure must be satisfied.  *Omni Capital International, Ltd v. Rudolph Wolff & Co.*, 484 U.S. 97, 104 (1987).[6]  Service which succeeds in providing a defendant with actual notice of the lawsuit, but fails to satisfy the technical requirements of Rule 4, will not permit a Court to obtain personal jurisdiction over a defendant absent a waiver of defective service.  It is well settled that a defendant's actual notice of the litigation is insufficient to satisfy Rule 4's service requirements.  *Way v. Mueller Brass Co.*, 840 F.2d 303, 306 (5th Cir. 1988).

---

[6] "Before a federal court may exercise personal jurisdiction over a defendant, the procedural requirement of service of summons must be satisfied.  '[S]ervice of summons is the procedure by which a court having venue and jurisdiction of the subject matter of the suit asserts jurisdiction over the person of the party served.'"  *Omni Capita*l, 484 U.S. at 104 (quoting *Mississippi Publishing Corp. v. Murphree*, 326 U.S. 438, 444-445 (1946)).

Consequently, a court lacks personal jurisdiction over a defendant even where deficient service of process affords the defendant notice of the suit.

Plaintiff purports to sue Defendant Crnkovich in her individual capacity.  In order for the Court to possess *in personam* jurisdiction over Defendant Crnkovich, proper service of process must have been effected on her.  Specifically, both the United States must be served in the manner prescribed by Fed. R. Civ. P. 4(i)(1), and Defendant Crnkovich must be personally served in the manner prescribed by Fed. R. Civ. P. 4(e). Fed. R. Civ. P. 4(i)(3).  Fed. R. Civ. P. 4(e) provides for the following means for individual service:

   1. effecting service upon them in the manner prescribed for serving a summons in an action brought in courts of general jurisdiction in the State of Texas;

   2. personally delivering a copy of the summons and the complaint to them;

   3. leaving a copy of the summons and complaint at their dwelling or usual place of abode with someone of suitable age and discretion who resides there; or

   4. delivering a copy of the summons and complaint to an agent authorized by appointment or by law to receive service of process.

The record reflects that proper service of process was not effected upon Defendant Crnkovich.  The Marshals Service personally delivered Defendant Crnkovich's copy of the summons and complaint to an unnamed BOP representative at FCI Big Spring, noting on both the Proof of Service form and the Process Receipt and Return form that FCI Big Spring was Defendant Crnkovich's residence or usual place of abode and that the unnamed representative was a person of suitable age and discretion residing there.  Doc. 27.  However, contrary to this notation, the summons and copy of the amended complaint were left at Defendant Crnkovich's place of business, not her residence or abode.  In the

absence of appointment by express agreement or by authority of law, service on a government official defendant sued in his individual capacity by personal delivery to another government official at the officials' workplace does not comply with the requirements of Rule 4(e). *Fox v. Mississippi*, 2012 WL 3154971, *5-6 (S.D. Miss. Aug. 2, 2012), *aff'd*, 551 Fed. App'x. 772, 775 (5th Cir. Jan. 8, 2014).

Moreover, to the extent attempted service in this manner might purport to be delivery to an agent authorized by appointment or law to receive service of process on Defendant Crnkovich's behalf, "[a]n agent must be expressly appointed for the purpose of receiving service." *Davis-Wilson v. Hilton Hotels Corp*., 106 F.R.D. 505, 508 (E.D. La. 1985). Nothing in the record reflects that Defendant Crnkovich expressly appointed or authorized another FCI Big Spring employee to accept service on her behalf, or that a provision of law independently created such authorization. Therefore, proper service of process has not been effected upon Defendant Crnkovich. Unless this defect is properly remedied, Plaintiff's claims must be dismissed for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2). [7]

---

[7] A plaintiff proceeding *in forma pauperis* "is entitled to rely upon service by the U.S. Marshals and should not be penalized for failure of the Marshal's Service to properly effect service of process, where such failure is through no fault of the litigant." *Rochon v. Dawson*, 828 F.2d 1107, 1110 (5th Cir.1987). Nevertheless, once such a plaintiff is aware of possible defects in service of process, he must attempt to remedy them. *Id*. Plaintiff's *pro se* status does not alter the requirement that service of process be timely and properly effected. *Kersh v. Derozier*, 851 F.2d 1509, 1512 (5th Cir.1988). Furthermore, the fact that the Plaintiff is incarcerated and proceeding *pro se* does not alter the requirements of proper service. *McNeil v. United States*, 508 U.S. 106, 113 (1993) (prisoner's *pro se* status does not excuse him from following procedural rules in civil litigation).

B.  Defendant Crnkovich is entitled to qualified immunity, and is therefore entitled to summary judgment in her favor.

An inmate seeking to prove his medical care violated the Eighth Amendment must allege facts demonstrating prison officials were deliberately indifferent to his serious medical needs.  *Morris v. Livingston*, 739 F.3d 740, 747 (5th Cir.), *cert. denied*, 2014 WL 1515174 (U.S. June 9, 2014) (citation omitted).  Deliberate indifference "is an 'extremely high' standard to meet" (*Brewster v. Dretke*, 587 F.3d 764, 770 (5th Cir. 2009)), and prison officials act with such indifference only if they 1) know an inmate faces a substantial risk of serious bodily harm, *and* 2) disregard that risk by failing to take reasonable measures to abate it.  *Brewster,* 587 F.3d at 770; *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006) (citation omitted).  Allegations of malpractice, negligence or unsuccessful treatment fail to meet this standard; instead, a prisoner must show conduct on the part of prison officials that evinces "a wanton disregard" for a serious medical need.  *Gobert*, 463 F.3d at 346.

In support of his complaint, Plaintiff has attached excerpts from his BOP medical file.  These records alone demonstrate he has not pled sufficient facts to state the violation of a constitutional right by the named individual Defendant.  Rather than demonstrating a wanton disregard for Plaintiff's condition, or a failure to take reasonable measures to abate it, the records show a consistent and thorough evaluation and treatment of Plaintiff's condition and complaints.  The medical records attached to Plaintiff's complaint and reply show Plaintiff was routinely seen by staff and his complaints were

addressed by following BOP policy.  These actions demonstrate anything but deliberate indifference to his medical needs.

Program Statement 6031.04 divides the scope of BOP medical services into five categories of care:  Medically Necessary – Acute or Emergent; Medically Necessary – Non-Emergent; Medically Acceptable – Not Always Necessary; Limited Medical Value; and Extraordinary.  Appx. pp. 1150-51.  Joint replacement procedures fall within the Medically Acceptable – Not Always Necessary category of care, which is defined as "Medical conditions which are considered elective procedures, when treatment may improve the inmate's quality of life."  Appx. p. 1151.  As a total knee arthroplasty is a joint replacement procedure, it falls within this category of care.

In accordance with Program Statement 6031.04, recommendations for joint replacement procedures always require review by an institution's Utilization Review Committee (URC).  Appx. p. 1151.  The URC typically includes multiple staff, including the institution's Health Services Administrator.  Appx. p. 1152.  As FCI Big Spring's Health Services Administrator, Defendant Crnkovich is part of the FCI Big Spring URC. Appx. p. 1221.

In accordance with BOP clinical practice guidelines, nonsurgical management of osteoarthritis is preferred and operative (*i.e.*, surgical) intervention is ordinarily reserved for "end-stage disease that fails to respond to nonsurgical interventions."  Appx. pp. 1209; 1212.  Nonsurgical management may be in both pharmacologic and nonpharmacologic form.  Appx. p. 1209. Options for pharmacologic interventions include analgesics, nonsteroidal anti-inflammatory drugs (NSAIDs), intra-articular

injections, and topical agents.  Appx. p. 1211.  Nonpharmacologic interventions are individualized to each patient and may include activity restrictions, exercises, weight loss, and durable medical equipment.  Appx. p. 1210.

If arthroplasty is being considered for treatment of osteoarthritis of the knee or hip, a multi-level review is required.  Appx. p. 1217.  At the institution level, this procedure involves both clinical evaluation by local medical staff and a review by the institution Clinical Director or URC.  Appx. p. 1217.  If the URC determines an inmate's case satisfies the criteria for further review, the URC then refers the evaluation to the BOP Regional Office for the geographic region of the BOP in which the institution is located.[8] Appx. p. 1217.

At a minimum, regional review consists of an initial review by a Registered Nurse/Improving Organizational Performance Officer.  Appx. p. 1217.  If the initial reviewer determines the inmate's condition meets the criteria for the surgical procedure under consideration, the initial reviewer may approve the procedure and return the surgical referral to the institution so the institution may prepare and submit a request to transfer the inmate to a BOP medical facility for the surgery and any needed post-surgical rehabilitation.  Appx. p. 1217.  If the initial reviewer determines the inmate's condition does not meet approval criteria, or if the initial reviewer is uncertain whether the inmate's

---

[8] The BOP has administratively divided its institutions throughout the country into six geographic regions.  Each region has a Regional Office that oversees and provides technical support to the institutions within the region.  FCI Big Spring is located in the BOP's South Central Region, which is comprised of all BOP institutions in Arkansas, Louisiana, Oklahoma, New Mexico, and Texas.  The BOP's South Central Regional Office is located in Grand Prairie, Texas.  *See* https://www.bop.gov/locations/regional_offices/scro/.

condition meets approval criteria, then the initial reviewer refers the request to the

Regional Medical Director for secondary review.[9]  Appx. p. 1217.

If the Regional Medical Director approves the procedure, the Regional Medical

Director returns the surgical referral to the institution so the institution may prepare and

submit a request to transfer the inmate to a BOP medical facility for the surgery and any

needed post-surgical rehabilitation.  Appx. p. 1217.  If the Regional Medical Director

denies the procedure, the Regional Medical Director returns the surgical referral to the

institution for additional information or returns the referral to the institution with

recommendations for non-surgical management.   Consistent with clinical practice

procedures at FCI Big Spring, an inmate may not be issued DME, including a walker,

unless approved by order of a physician or mid-level provider (e.g., a physician's

assistant or nurse practitioner) after the mid-level provider either directly evaluates the

inmate or after consultation with a lower level clinical provider, such as a registered

nurse, who may be directly evaluating the inmate at the time.  Appx. p. 1221.

Plaintiff's medical records disclose a lengthy and complex course of evaluation

and treatment for problems with both knees, along with a variety of other medical

concerns.  However, with the exception of her involvement in URC review of the

orthopedic surgeon's November 5, 2015 recommendation for a right total knee

arthroplasty and two email responses, the record discloses no personal involvement by

---

[9] A Regional Medical Director is a senior BOP physician responsible for guidance and oversight of inmate clinical services for institutions in the BOP region to which the Regional Medical Director is assigned.

Defendant Crnkovich in any aspect of Plaintiff's medical care.  Defendant Crnkovich never personally saw or treated Plaintiff.

In fact, neither the URC nor Defendant Crnkovich disapproved the recommended surgical procedure.  Rather, the URC referred the recommendation to the appropriate BOP regional office as required by BOP clinical practice guidelines.  The request was ultimately disapproved at the regional level, with a recommendation for continued conservative management.  Defendant Crnkovich had no personal involvement in the regional office denial.

Plaintiff alleges that Defendant Crnkovich improperly denied his requests for a walker, however, such claims do not rise to the level of demonstrating Defendant Crnkovich's personal involvement in a constitutional violation.  An inmate cannot demonstrate a defendant's personal involvement in alleged deliberate indifference to a serious medical need "simply by casting his complaint regarding the denial of his medical grievances – or dissatisfaction with the outcome of his grievances – in the form of a claim of personal involvement by [a defendant's] through her failure to act on [the inmate's] grievance in a way that [the inmate] believed appropriate."  *Garret v. Susler*, 2018 WL 1192996, * 5 (E.D. Tex. Mar. 7, 2018).

In his Reply, Plaintiff attaches some emails he sent requesting a walker(Attachment E to Reply) and copies of attempts at informal resolution he submitted as part of the BOP's administrative remedy process (Attachments B and F to Reply).  The electronic mail address to which Plaintiff submitted his email requests is a group address accessible by more than one person in the FCI Big Spring Health Services

Department, and Defendant Crnkovich does not specifically recall having seen or responded to the electronic mail messages Plaintiff submitted as exhibits to his Reply. Appx. p. 1222.  While it is possible that Defendant Crnkovich authored some or all of the responses to Plaintiff's requests, it is also possible that another FCI Big Spring Health Services Department employee did so and she merely approved the responses.

Additionally, each of these email requests attached to Plaintiff's Reply were submitted before November 30, 2015, the date on which FCI Big Spring received the orthopedic surgeon's report with its recommendations regarding durable medical equipment.  Consistent with clinical practice procedures at FCI Big Spring, an inmate may not be issued durable medical equipment such as a walker unless approved by order of a physician or MLP (e.g., a physician's assistant or nurse practitioner).

The first of the attempts at informal resolution attached to Plaintiff's Reply (Attachment B) is dated October 7, 2015, almost a month before the orthopedic surgeon evaluated him on November 5, 2015.  Plaintiff did not request a walker in this submission and there had not been a recommendation for him to receive a walker at the time.  The second of the attempts at informal resolution (Attachment F) is dated November 22, 2015, and Defendant Crnkovich responded on November 30, 2015, the date the FCI Big Spring Health Services Department received the orthopedic surgeon's report.  To the extent the orthopedic surgeon's report referenced durable medical equipment, it *recommended* a variety of such equipment as Plaintiff's condition progressed and his symptoms waxed and waned.  It did not *order* any such equipment at any given time or under any specific circumstances.

Additionally, Plaintiff's request was for a wheeled walker.  The orthopedic surgeon recommended a walker, cane, or wheelchair, but not a wheeled walker.  In fact, at the time, Plaintiff was already using a cane, one of the kinds of equipment the orthopedic surgeon had recommended.  Moreover, Defendant Crnkovich is a registered nurse, not a physician or MLP and cannot independently approve durable medical equipment.  Appx. p. 1222.

Furthermore, Defendant Crnkovich's current position is administrative in nature, and does not routinely involve performing clinical evaluations of inmates.  Appx. p. 1223.  To the extent she may have been involved in issuing durable medical equipment to any inmate, while it is not entirely outside the realm of possibility that she might have participated in evaluation of the inmate, it is more likely that her involvement would have taken the form of reviewing the inmate's medical record for the existence of an order approving such equipment before issuing the equipment or causing the equipment to be issued.  Appx. p. 1223.  Plaintiff cannot demonstrate personal involvement by Defendant Crnkovich merely because she denied his administrative grievances regarding his request for a walker.  *See Garret v. Susler*, 2018 WL 1192996, * 5 (E.D. Tex. Mar. 7, 2018).

Ultimately, if Plaintiff was dissatisfied with the responses he received to his requests for a walker, he had the option of reporting to sick call and requesting the necessary evaluation for a physician or MLP to determine whether ordering durable medical equipment was clinically indicated based upon the progression of Plaintiff's condition or on changes in his symptoms.  Appx. p. 1223.  To the extent Plaintiff alleges that an FCI Big Spring nurse told him otherwise on November 17, 2015, the record

Plaintiff cites belies his claim.  It specifically states Plaintiff could "Follow-up at sick call as needed to be evaluated by provider."  Doc. 35, p. 34.

Finally, to the extent Plaintiff appears to claim that Defendant Crnkovich was somehow involved in a delay in his evaluation by a physician and alleged resulting delays in physical therapy or an MRI study, Defendant Crnkovich is not routinely involved in scheduling inmates for physician evaluation.  Appx.  p. 1222.  Plaintiff has failed to demonstrate and the record does not reveal the requisite personal involvement by Defendant Crnkovich in any alleged deliberate indifference to Plaintiff's serious medical needs.  Thus, as neither Plaintiff's allegations nor the record demonstrate that Defendant Crnkovich violated Plaintiff's clearly established constitutional rights, Defendant Crnkovich is entitled to summary judgment in her favor pursuant to the doctrine of qualified immunity.

## V.   CONCLUSION

The record before the Court demonstrates a lack of personal jurisdiction over Defendant Crnkovich.  Additionally, Plaintiff's complaint and amended complaint, along with the attached medical record excerpts, shows persistent evaluation, diagnosis, treatment and follow-up care for his condition.  Because Plaintiff's allegations do not establish deliberate indifference by this individual Defendant to his medical condition, he fails to plead the violation of a constitutional right, and all claims asserted against this individual Defendant should be dismissed.  For all the reasons stated herein, the United States requests summary judgment on all claims against Defendant.

Respectfully submitted,

ERIN NEALY COX
UNITED STATES ATTORNEY
/s/ Ann E. Cruce-Haag
ANN E. CRUCE-HAAG
Assistant United States Attorney
Texas Bar No. 24032102
1205 Texas Avenue, Suite 700
Lubbock, Texas 79401
Telephone:   (806) 472-7351
Facsimile:   (806) 472-7394
Email:       ann.haag@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on May 2, 2018, I electronically filed the foregoing document

with the clerk of court for the U.S. District Court, Northern District of Texas, using the

electronic case filing system of the court.  Service upon the pro se plaintiff was

accomplished by placing a true and correct copy of the foregoing in the United States

mail addressed to:

Mr. Robert Alan Thompson
#17709-280
BOP FCI Big Spring
1900 Simler Avenue
Big Spring, Texas 79720

/s/ Ann E. Cruce-Haag
ANN E. CRUCE-HAAG
Assistant United States Attorney